**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| J.P. AND R.P., | ) | |
|         Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. CIV-08-0937-HE |
| | ) | |
| ENID PUBLIC SCHOOLS, | ) | |
| | ) | |
|         Defendant. | ) | |

## **ORDER**

The Individuals with Disabilities Education Act ("IDEA") provides federal money to assist state and local agencies in educating children with special needs, and conditions such funding upon a state's compliance with the requirements of the Act. Among other things, the IDEA requires states to provide disabled children with a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). To provide a FAPE, the ACT requires that an "individualized education program" ("IEP"), coordinating the educational goals of the child and the special services to be provided, be established and maintained. *Id.* §§ 1412 (a)(4) & 1414(a)(5).

Father R.P. and son J.P. bring this action against Enid Public Schools ("the District") alleging violations of the IDEA. Specifically, plaintiffs contend that the District (1) failed to timely identify J.P. as child in need of special education services and (2) failed to provide J.P. with a FAPE. Plaintiffs seek to recover compensatory education for the period J.P. was enrolled in the District, but allegedly not receiving a FAPE, as well as reimbursement for expenses incurred when R.P. placed J.P. in a private educational facility.

In the initial due process hearing before the Oklahoma Department of Education, the hearing officer found in favor of the District. The hearing officer concluded that plaintiffs' claims arising before October 5, 2005, are barred by the IDEA statute of limitations; plaintiffs' claims arising after December 2007 fail because the District had no duty to provide educational services after J.P. no longer resided in the District; and plaintiffs' claims for compensatory education and reimbursement in the interim period fail because the District properly provided J.P. a FAPE. The hearing officer was affirmed on administrative appeal. Before the court are cross-motions for judgment on the administrative record. After thorough review of the record, the court affirms the decision of the hearing officer below.

## Standard of Review

The IDEA provides courts a unique standard of review, differing from the typical deferential standard for administrative proceedings. Under the Act, a court must independently review the record and apply a preponderance of the evidence standard to decide if the requirements of the IDEA have been met. Systema v. Acad. Sch. Dist. No. 20, 538 F.3d 1306, 1311 (10th Cir. 2008). Specifically, the Act provides that a court must (1) "receive the records of the administrative proceedings," (2) "hear additional evidence at the request of a party," and (3) "basing its decision on the preponderance of the evidence . . . grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). During review of the administrative record, the court must give "due weight" to the hearing officer's findings of fact, "which are considered *prima facie* correct." Systema, 538 F.3d at 1311 (citation omitted). The Tenth Circuit has dubbed this standard a "modified de novo" review.

*Id.*

Plaintiffs initially couched their motion to this court as a motion for summary judgment. Because "the IDEA requires a district court to grant judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issue of material fact.'" L.B. v. Nebo Sch. Dist., 379 F.3d 966, 974 (10th Cir. 2004). Such motions, including plaintiffs', are better understood as motions for judgment on the administrative record. Id.

## Factual Background

J.P. was involved in a serious motor vehicle accident in November 2002.[1] His mother died at the scene and he, his father, and his brother were injured. J.P. was ejected from the vehicle and found unconscious and severely hurt. Among other things, he suffered a traumatic brain injury ("TBI"). Following the accident, J.P. underwent significant rehabilitation, but was left with serious cognitive and psychological impairments due to the TBI that continue to affect his life. He suffers from Dysexecutive Syndrome, affecting many life skills including planning, setting goals, solving problems, evaluating performance, self-monitoring, and organization of activities.

J.P. was in the ninth grade at the time of the accident and was enrolled in Clark

---

[1] *The following facts are adapted directly from the findings made by the hearing officer and adopted by the appellate officer below. These findings are accepted as prima facie correct. Systema, 538 F.3d at 1311. Findings disputed before this court are so noted and discussed. Citations to the record are provided for facts not noted in the hearing officer's report.*

County School District ("Clark County") in Las Vegas, Nevada. After being released from the hospital and completing in-patient rehabilitation, J.P. returned to school in Clark County. At the request of R.P., Clark County assessed J.P.'s educational needs and determined that J.P. was eligible for special education services as a result of his TBI. In February 2003, Clark County developed an IEP for J.P. placing him in a regular education setting for 83% of the school day and in a special education setting for 17% of the day. In the remainder of that school year, J.P. earned a 1.667 grade point average, which R.P. testified was typical of J.P.'s performance before the accident.

In August 2003, R.P. moved to Enid, Oklahoma, and enrolled J.P. in the District to repeat the ninth grade. J.P. was assigned to Longfellow Junior High School where he was enrolled by counselor Ilene Zander-Littlefield. At the time of enrollment, Littlefield requested J.P.'s records from Clark County, but the records received did not reveal J.P.'s TBI or prior IEP. At that time, R.P. also completed a health disclosure form for J.P., but did not indicate any health or medical concerns.

J.P. did not initially receive special education services in the District. During his ninth grade year at Longfellow, J.P. received a below average grade point and failed several courses. The next fall J.P. began the tenth grade at Enid High School where he had poor, but passing, grades his first semester. Near the end of the fall semester–one and a half years after initially enrolling J.P. in the District–R.P. expressed concern about J.P.'s performance to counselor Anita Trojan. At that time, R.P. informed Trojan of J.P.'s TBI and informed her that J.P. had been found in need of special education services while in Clark County. After

4

receiving that news, Trojan passed on J.P.'s information to a District psychologist and scheduled a multidisciplinary team (MEETS team) meeting.

The MEETS team met on December 17, 2004, and concluded that J.P. was in need of special services to address the problems caused by his TBI. The team assigned District employee Jennifer Patterson as his special education teacher and case manager. An IEP meeting was immediately scheduled for December 20, which R.P. and J.P. both attended. At that meeting, the IEP team considered J.P.'s post-accident medical records, his records from Clark County, and his past behavior in the District. Based on this information, the team concluded that J.P.'s initial IEP should include one 90-minute block of time every other day to work on study skills in the special education setting. Further, the team agreed that J.P. should focus on developing employment and post adult living skills.

Following the meeting, Jennifer Patterson informed J.P.'s regular education teachers of the special modifications needed in line with his IEP. Patterson continued to regularly communicate with J.P.'s teachers to monitor his performance.

In the special education classroom, Patterson developed strategies to address many of J.P.'s academic and organizational problems, including reminders to take home books, repeating directions from regular teachers, breaking down assignments into simpler steps, and the use of a planner. Patterson also worked with J.P. on employment skills, including completing mock job applications, conducting mock interviews, and creating simulated directions from and interactions with employers. Vol. II., Section E.5, p. 201. J.P. also began seeing Kim Poslick, a licensed counselor for the District, once a week to help manage

grief issues arising from the loss of his mother, drug abuse issues, and academic struggles. At that time, Poslick performed a psychosocial assessment and decided to focus their treatment on J.P.'s marijuana use, short term memory problems, inability to stay focused, lack of motivation, grief and other family issues. The drug abuse counseling led to reduced marijuana use.

In the beginning of March 2005, an IEP meeting was called by Patterson because J.P. was having trouble in his history course. At that meeting, the team decided that J.P. should take his history class in the special education room where he could work at his own pace. Another IEP meeting was called in April 2005, as J.P.'s struggles began to spread to all of his classes. There, J.P. indicated to the team that he felt in over his head. In light of the relative success J.P. was achieving in the special education classroom, the team decided to increase his time there. Further, the team concluded that J.P.'s participation in a work-study program would reduce some of the academic pressure by lightening his class load, while teaching him important job and social interaction skills. The team agreed that this placement should be in a job on the school campus. J.P. was assigned a job coach to train and supervise him in his new position as a custodian. In August 2005, when he began his junior year, J.P. was assigned a new job in the school cafeteria where he similarly had a job coach.

Another IEP meeting was called for October 12, 2005, after J.P. had been placed in OJA custody and was remanded to a juvenile detention center ("JDC"). At the meeting, the IEP team worked with Lois Fox, who would be J.P.'s teacher at the JDC, to develop a plan to provide educational services there consistent with the curriculum he was receiving at the

high school. The IEP team met again on November 8, 2005, in anticipation of J.P.'s release, and concluded that he should now receive all of his instruction in the special education classroom. While J.P. was in detention, the District held his position in the school cafeteria and he returned to it on his release.

In the beginning of January 2006, J.P. was again placed in detention by the OJA and the IEP team met on January 11 to discuss the provision of educational services while he was in detention. On February 23, the team met again and concluded that, upon his release, J.P. would continue to receive the same services as he had received prior to detention. R.P. participated in all of J.P.'s IEP team meetings and never indicated any disapproval of the decisions reached.

By March 2006, J.P. was back in OJA custody and was placed in the Thunderbird Youth Academy ("Thunderbird"). On March 29, J.P. was withdrawn from the District and a "Release of Compulsory School Attendance" was executed to facilitate J.P.'s placement at Thunderbird. J.P. was released from the that facility on July 13, 2006.

The parties dispute whether J.P. ever returned to Enid High School for the 2006-2007 school year. R.P. testified that J.P. returned to school for a short time in August of 2006. Vol. IV, Section E.2, p. 139. The hearing officer concluded that J.P. did not return to the District during this period. The court agrees that the weight of the evidence does not establish that J.P. returned to school during that time. The only evidence supporting his return was the testimony of R.P., whose memory on the issue appeared unconvincing at best. In contrast, seven school officials, including administrators, counselors, and special

education staff, testified that they did not see J.P. during the 2006-2007 school year. Among those is teacher Jennifer Patterson who would have continued to directly manage J.P.'s case were he to have returned to school.

R.P. testified that he was concerned about J.P.'s impulsive behavior after J.P. returned from Thunderbird Academy and called his attorney for advice. Vol. II, Section E.2., p. 141. The attorney's office contacted Dr. Ronald Savage, an expert on TBIs, who had evaluated J.P. in the beginning of 2006. Vol. II., Section E.4, p. 65. Dr. Savage testified that the attorney communicated to him R.P.'s concern that J.P. was "a danger to himself and others." *Id.* From that secondhand statement and a general understanding of J.P.'s status, Dr. Savage concluded that J.P. needed to be placed in a residential TBI rehabilitation facility immediately. *Id.* at p.66. At the time of the recommendation, Dr. Savage had not personally evaluated J.P. since November 2006.[2] Sometime after receiving the recommendation from Dr. Savage, R.P. visited the Neurological Rehabilitation Living Center ("NRLC") in Covington, Louisiana, to tour the facilities. Vol. II, Section E.2, p. 141. On September 4, 2006, R.P. enrolled J.P. at the NRLC. R.P. provided no notice to the District of this placement.

Plaintiffs contend that the placement was necessary to stop the "crisis" that J.P. was

---

[2] *The hearing officer noted "serious doubts" about the credibility of Dr. Savage in his report. Vol. V, Section I, pp. 15-16. These doubts arose not only from Dr. Savage's limited contact with R.P. and J.P, but also because Dr. Savage frequently cited information as fact that "clearly contradict[ed] the record." Id. These errors, the hearing officer found, gave Dr. Savage's report the "appearance of being 'boiler plate.'" Id.*

then undergoing. The hearing officer, however, concluded that no evidence supported that conclusion. The hearing officer found that J.P.'s enrollment at the NLRC was a planned action not taken in the haste of emergency, as evidenced by, among other things, the time taken by R.P. to make a preliminary visit.

While at NLRC, J.P. received numerous services to address problems caused by his TBI, including speech, physical, and occupational therapy. With regard to special education services, however, the record includes only vague references to J.P. being tutored in preparation for the GED exam, and does not indicate any details such as the subjects taught or the methods of instruction. J.P. did not receive his GED while at the NRLC.

J.P. completed his stay at the NLRC on July 2, 2007. R.P. filed his request for a due process hearing with the Oklahoma Department of Education on October 5, 2007.

## Statute of Limitations

The hearing officer concluded that plaintiffs' claims arising prior to October 5, 2005–two years before the plaintiff's hearing request–are barred by the IDEA's statute of limitations. The barred claims include plaintiffs' claim that the District failed to timely identify J.P. as in need of special education services ("Child Find" claim) and their claim for compensatory education for failure to provide a FAPE, insofar as that claim is based on District conduct occurring prior to October 5, 2005. The court agrees.

Under the IDEA, a plaintiff must "request an impartial due process hearing within 2 years of the date [he] knew or should have known about the alleged action that forms the

basis of the complaint" unless "the State has an explicit time limitation for requesting such a hearing." 20 U.S.C. § 1415(f)(3)(C). Oklahoma does not have a specific statute of limitations. Both the Child Find claim and the compensatory education claims are barred by § 1414(f)(3)(C).

Plaintiffs' Child Find claim is based on the failure of the District to identify J.P. as a child with special needs within a reasonable time of his initial enrollment there in the fall of 2003. The District did not evaluate J.P.'s needs until December 2004. During the interim period, R.P. was aware that J.P. had previously been identified while in Clark County as needing special education. Further, R.P. was aware that the District had not conducted an IEP and admittedly believed, as early as Fall 2003, that J.P. was not receiving appropriate services. Vol. II, Section E.2, p. 84. The District's failure to identify J.P. as in need of special education services "forms the basis" of the plaintiffs' Child Find complaint. 20 U.S.C. § 1415(f)(3)(C). Because R.P. was aware of this failure for more than two years before requesting a due process hearing, the claim is barred by the IDEA statute of limitations.

Plaintiffs' claim for compensatory education is based in part on actions or inaction by the District that R.P. was aware of prior to October 5, 2005. R.P. knew that J.P. received special education services while residing in Clark County, Nevada, and that no such services were received for a year and a half after enrolling in school in Enid. Despite this knowledge, R.P. failed to request a due process hearing until October 5, 2007. Therefore, pursuant to § 1414(f)(3)(C), plaintiffs' claim for compensatory education is barred insofar as they seek

recovery for periods prior to October 5, 2005.

Plaintiffs contend that their claims are not barred by the IDEA statute of limitations because R.P. requested a due process hearing "as soon as he was aware that the District's actions formed the basis for a complaint." The IDEA's two-year limitation on claims, however, is triggered when the parent "knew or should have known about the alleged *action* that forms the basis of the complaint" and not when the parent becomes aware that the school district's actions are actionable. 20 U.S.C. § 1415(f)(3)(C) (emphasis added); *see* Bell v. Bd. of Educ., No. CIV 06-1137, 2008 WL 4104070 at *17 (D.N.M. Mar. 26, 2008) (noting that the "IDEA's plain language states that the limitations period is two years from the date that the parents knew of the complained-of action, not two years from the date that the parents knew the action taken was wrong"). Even assuming R.P. was unaware of his right to request an IDEA due process hearing,[3] the plaintiffs' pre-October 5, 2005 claims are barred under § 1415(f)(3)(C).

## Oklahoma Residency Requirement

The hearing officer concluded that the plaintiffs cannot recovery reimbursement from the District for the time J.P. spent at NRLC after December 2006 because R.P. was no longer a resident of the District during that time. The appellate officer affirmed. The court agrees.

The IDEA looks to state law for determining the educational responsibilities of school

---

[3] *Plaintiffs' argument that R.P. was not aware of his rights under the IDEA prior to October 5, 2005, is suspect in light of evidence that he received pamphlets describing his IDEA rights on four separate occasions during the 2005-2006 school year. Vol. II., Section E.5, ¶. 174-75, 183.*

districts. 20 U.S.C. § 1413(a)(1). School districts in Oklahoma are not responsible for providing education services for children that are not residents of their district. Title 70 Okla. Stat. § 13-101 requires Oklahoma school districts to provide services to students residing within their district. Further, 70 Okla. Stat. § 1-113(B) provides that "[n]o school district shall bear the cost of educating children who are not residents of this state." A child's residence "for school purposes shall be . . . [t]he school district in which the parents, guardian, or person having legal custody holds legal residence." 70 Okla. Stat. § 1-113(A)(1). R.P. moved from Enid, Oklahoma, to Pahrump, Nevada, in December of 2006. Vol. II., Section E.2, ¶. 144-45. After that point, J.P. was not a resident of Enid, Oklahoma, and the District cannot be required to reimburse plaintiffs' for J.P.'s placement at NRLC after that date.

## Reimbursement & Compensatory Education

The hearing officer concluded, and the appellate officer affirmed, that the District is not liable for reimbursement to plaintiffs for any expenses related to J.P.'s placement at NRLC, nor is it liable for compensatory education for the portion of the 2005-2006 school year not otherwise barred by the IDEA statute of limitations. The court agrees.

Upon finding a violation of the IDEA, the court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). This includes the power to order reimbursement to a parent after his unilateral placement of a child at a private educational facility. *Id.* § 1412(a)(10)(C)(ii). Courts may also have the power to order "compensatory education." Compensatory education is an equitable remedy awarding additional services

for children who did not receive appropriate educational services in the past. Several courts of appeals have recognized that compensatory education is an available remedy under the IDEA,[4] but the Tenth Circuit has yet to decide the issue.[5] Because the court finds that the District did not fail to provide J.P. with a FAPE during the applicable periods following October 5, 2006, there is no need to decide whether courts have the authority to order compensatory education under the IDEA.

To recover either reimbursement or compensatory education, plaintiffs must prove by a preponderance of the evidence that the District has violated the IDEA. 20 U.S.C. §§ 1412(a)(10)(C)(ii) & 1415(i)(2)(C)(iii). An IDEA violation may be shown through either (1) proof that the school district failed to provide the student with a FAPE, or (2) proof that, despite providing a FAPE, the school district did not provide that education in the least restrictive environment. Thompson R2-J Sch. Dist. v. Luke P., 540 F.3d 1143, 1148 (10th Cir. 2008). Here, plaintiffs confine themselves to the first type of violation, claiming only that the District failed to provide J.P. a FAPE.

To recover reimbursement, plaintiffs must additionally show that (1) R.P. provided the District with notice prior to placing J.P. in a private facility, 20 U.S.C. §

---

[4] See Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 522 (D.C. Cir. 2005) *(collecting cases reaching this conclusion).*

[5] See Miller ex rel. S.M. v. Bd. of Educ., 565 F.3d 1232, 1249 n.11 (10th Cir. 2009) *(recognizing that the issue remains undecided in the Tenth Circuit).*

1412(a)(10)(C)(iii), and (2) that the private facility chosen was appropriate for J.P.'s needs.[6] Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14 (1993).

With regard to plaintiffs' claim for compensatory education, the court must consider the period between October 5, 2005, the earliest date not barred by the statute of limitations, and March 29, 2006, the last time at which J.P. was enrolled with the District.[7] With regard to plaintiffs' claim for reimbursement, the court considers the period between September 5, 2006, when J.P. enrolled at NRLC, and December 1, 2006, when R.P. moved out of the District.[8]

**A.**

The hearing officers concluded that plaintiffs failed to prove that the District denied J.P. a free and appropriate public education. The appellate officer affirmed. The court

---

[6] *Because the court concludes that (1) the District properly provided J.P. with a FAPE and (2) R.P. failed to provide the District notice of J.P.'s placement at the NRLC–both of which independently preclude recovery of reimbursement–it is unnecessary to determine whether the NRLC was an appropriate facility to meet J.P.'s needs.*

[7] *On March 29, 2006, Enid High School principal William Wood executed a "Release of Compulsory School Attendance" to facilitate J.P.'s placement at Thunderbird Youth Academy. Vol. III, Section F.1, Tab 65.*

[8] *R.P. moved from Oklahoma to Nevada in December 2006, relieving the school district of any duties under the IDEA after that point. At the due process hearing R.P. testified that he could not remember when in December he moved to Nevada, but that he knew he had to be moved out of his house by December 1. Because a preponderance of the evidence does not support a later date, the court accepts December 1 as R.P.'s last day of residence in Enid, Oklahoma.*

agrees.

In assessing whether a school district has or has not provided a disabled student with a FAPE, courts follow a two-step inquiry set forth by the Supreme Court in Board of Education v. Rowley, 458 U.S. 176, 206-07 (1982). First, the court considers whether the school district complied with the procedures set forth in the IDEA, including the specific requirements of an IEP. Garcia v. Bd. of Educ., 520 F.3d 1116, 1125 (10th Cir. 2008). Next, the court looks to whether the special education services provided to the student in the IEP are reasonably calculated to enable the child to receive educational benefits. *Id.*

In the present case, plaintiffs do not contend that the District failed to comply with the IDEA's prescribed procedures for developing IEPs. Instead, focusing on the second half of the Rowley test, plaintiffs argue that the IEPs developed by the District were not reasonably calculated to enable J.P. to receive educational benefit.

The lynchpin of the IDEA, with regard to ensuring that disabled children receive a FAPE, is the IEP. The Rowley Court recognized that the IDEA intentionally avoids setting concrete substantive requirements, choosing instead to impose detailed procedural guidelines that better accommodate the individual needs of each child. Rowley, 458 U.S. at 206.[9] The IDEA's approach relies heavily on proper compliance with the IEP process producing a good

---

[9] *"We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Rowley, 458 U.S. at 206; see Thompson R-2J Sch. Dist., 540 F.3d at 1152-53.*

15

substantive result.  Because of this, review of an IDEA claim should focus principally on whether the IEP process was complied with rather than on decisions with regard to educational policy and substantive outcomes.  Hence, the Rowley test asks whether the IEP was *reasonably calculated to* provide an educational benefit, not whether an educational benefit was actually achieved.  Plaintiffs argue that the hearing officer below erred in looking beyond the four-corners of the IEP document in determining whether the District provided J.P. with a FAPE.  The Tenth Circuit has squarely rejected such a contention:

> [A]n IEP is a program, consisting of both the written IEP document, and the subsequent implementation of that document. While we evaluate the adequacy of the document from the perspective of the time it is written, the implementation of the program is an on-going, dynamic activity, which obviously must be evaluated as such.

*O'Toole v. Olathe District Schools*, 144 F.3d 692, 692 (10th Cir. 1998).

**1.**

After considering both the IEP documents and their implementation as evidenced in the administrative record, the court agrees that the District did not fail to provide J.P. with a FAPE.  As plaintiffs point out, the IEP documents themselves are, unfortunately, quite sparse. The evidence of the IEPs as implemented, however, demonstrates that the District's efforts were reasonably calculated to provide J.P. with some educational benefit.

Many of the services that plaintiffs point to as lacking from the IEP document were actually provided by the District.  Plaintiffs contend that J.P.'s IEPs lacked instruction on organizational skills, yet the evidence shows that J.P.'s program included consistent instruction on how to use a daily planner, how to break tasks down into smaller parts, and

other similar efforts. Plaintiffs contend that J.P.'s IEPs lacked instruction to facilitate academic progress, yet J.P. spent significant time in the special education classroom focused on learning to outline chapters, learning to use glossaries and indexes, and other activities designed to better equip J.P. in the regular classroom. The evidence indicates J.P.'s special education teacher communicated frequently with his regular teachers to modify their instruction to better serve J.P. Plaintiffs contend that J.P.'s IEPs lacked attention to his emotional-well being, but licensed counselor Kim Poslick testified that she met with J.P. weekly to address emotional issues and related drug abuse. Plaintiffs contend that J.P.'s IEPs failed to cover employment skills, but J.P.'s special education instructor conducted mock job applications, interviews, and employment scenarios to help J.P. prepare himself for the workplace. J.P. was even enrolled in a work-study program, allowing him to be employed on campus. While J.P.'s IEP documents themselves fail to specify every area in which J.P. was in need of special services, the IEPs in practice provided him with an array of special education services personalized to his own needs and calculated to provide him an educational benefit.

**2.**

Plaintiffs also contend that J.P.'s IEPs were inadequate because J.P. should have been placed in a residential treatment center. The court disagrees. Plaintiffs argue that J.P.'s behavioral problems–drug abuse, truancy, and the lack of impulse control–interfered with his education and, because of their severity, should have been addressed in a residential facility. While the court disagrees, at least in part, with the hearing officer's conclusion that

J.P.'s "behavioral problems are separate from his education troubles," his behavioral problems were not so severe as to prevent him from receiving some educational benefits from the IEPs. Certainly, with less drug use and better school attendance, J.P. would have benefitted more from his IEPs. And, certainly, a residential facility might better solve these problems. Nevertheless, the IDEA does not require school districts to "maximize each child's potential." Rowley, 458 U.S. at 198; *see* Thompson R-2J Sch. Dist., 540 F.3d at 1149. Instead, "Congress sought only to require a 'basic floor of opportunity,' aimed at providing '*some* educational benefit.'" Thompson R-2J Sch. Dist., 540 F.3d at 1149 (quoting Rowley, 458 U.S. at 200) (emphasis added by Thompson court). From the Rowley Court's direction, the Tenth Circuit has "concluded that the educational benefit mandated by IDEA must merely be more than *de minimis*." *Id.* (quoting Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 727 (10th Cir. 1996). The evidence shows that J.P.'s IEPs were reasonably calculated to provide at least "some" educational benefit while remaining at Enid High School.

**B.**

Even assuming that the district failed to provide J.P. with a FAPE, plaintiffs may be denied reimbursement because R.P. failed to provide the District with notice prior to placing J.P. at NRLC. The IDEA provides that the cost of reimbursement may be reduced or denied if the parents did not provide the school district with notice of, among other things, "their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii). This notice must be given at either the most recent IEP meeting or ten

days prior to the removal of the child from the public school. *Id.* R.P. did not notify the District of his intent to enroll J.P. at a private facility, nor ever indicate to the IEP team any disapproval whatsoever of the plan J.P. was on.

Plaintiffs do not fall under any of the statutory exceptions to the notice requirement. Plaintiffs argue that notice was excused because J.P. was admitted to the NRLC on an emergency basis. Under the IDEA, notice is excused if compliance with the notice requirement "would likely result in physical or serious emotional harm to the child." *Id.* § 1412(a)(10)(c)(iv). The evidence does not support plaintiffs' claim that, but for his immediate placement at the NRLC, J.P. would have suffered severe emotional distress.

R.P. testified that he enrolled J.P. at the private facility because J.P. was a danger to himself and others. Beyond this statement, however, plaintiffs provide no evidence that J.P. was such a danger. Plaintiffs' expert Dr. Savage testified that he recommended the immediate placement of J.P. at a residential facility because J.P. was in a "crisis." However, Dr. Savage's recommendation was based on a secondhand statement by R.P.–communicated to Dr. Savage through R.P.'s lawyer–that R.P. believed that J.P. was a danger to himself and others. At the time of the recommendation, Dr. Savage had not seen J.P. for approximately nine months.

Further, the evidence suggests that R.P. himself did not treat the situation as an emergency. R.P. took the time to travel to Covington, Louisiana, and tour the NRLC facility before deciding to enroll J.P. there. If J.P.'s condition permitted this delay in treatment, R.P. could easily have notifying the District of his decision. These facts do not support a finding

that J.P. would have suffered severe emotional distress had R.P. complied with the IDEA notice requirements. Therefore, notice was not excused.

### Conclusion

The IDEA evidences a congressional intent that states, acting through local school districts, provide educational assistance to disabled children and their families just like J.P. and R.P. The Act, however, is a measured effort and does not require states to ensure every child reach a certain level of achievement. Instead, it calls only for an individual educational plan that is sensibly designed to enable a particular child to achieve some educational benefit. Both the hearing and appellate officers below found that the District provided J.P. with such an opportunity, and this court agrees. The decision of the hearing officer is **AFFIRMED**.

**IT IS SO ORDERED**.

Dated this 23rd day of September, 2009.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE